TANKER HYGRADE NO. 16, Inc., as owner of THE Tank Barge HYGRADE NO. 16, Libelant,

v.

THE Tug GEORGE H. JACKSON, Claimant,

and

THE Tug CARMELITE II, Claimant-Impleaded.

No. 20077.

United States District Court
E. D. New York.

June 6, 1958.

Foley & Martin, New York City, for libelant, by Edward J. Ryan, New York City, of counsel.

Hagen & Eidenbach, New York City, for claimant, by Charles W. Hagen, New York City, of counsel.

BYERS, Chief Judge.

■ This case involves a collision between two tows proceeding in opposite directions in Newark Bay on September 6, 1951 at about 1:35 a. m. The night was dark, but visibility was good, and weather conditions played no part in the happening; the waters were calm and if both navigators had been alert to their duties, the collision should not have occurred.

The exact place is not in dispute, namely at the northeast abutment of the Central Railroad bridge as it crosses Newark Bay, on its northerly side.

Both tows were endeavoring to pass under the easterly span of that bridge, the width of the channel being 134 feet.

The southbound tow consisted of the libelant's tank barge Hygrade No. 16 (fully laden with fuel oil) which was being pushed by the diesel tug Carmelite II.

The Hygrade is 214.5 feet in length and her beam is 43.15 feet. The tug is 83.4 feet in length and has a beam of 22.-5 feet; thus the tow was about 300 feet long.

The northbound tow consisted of the steam tug Jackson which was pushing the dump scows 57 and 56, that is, the latter was made fast to the starboard of the former, and the tug was pushing the 56. These scows were fully laden with sand, and their dimensions as to length cannot be stated because the record was never clarified on this subject. The oral stipulation was that the 57 was 120 feet long by 42.5 beam, and the 56 was 165 feet long with a beam of 42.6.

The captain of the tug, who professed entire familiarity with the subject for persuasive reasons, stated that the scows each were 225 feet long. The fore and aft dimensions of the scows is important only with reference to the actual difference in the ability of the navigator of the Jackson to accurately state the distance of his tug south of the bridge at the time he made certain observations later to be referred to.

Fortunately there is no dispute as to the width of the scows as above stated, but since they were made up alongside there was probably a foot or two of water between them, making the over-all width of the Jackson tow somewhat in excess of 85 feet.

The Jackson is 77 feet long with a beam of 20 feet, and thus the length of this tow cannot be clearly stated.

Both tows were of course navigable but somewhat unwieldy.

There is no criticism of the horsepower of either tug and it is agreed that all proper lights were showing, namely running lights as to each tug and staff lights as to the Carmelite tow and corner lights on the outside corners of the Jackson tow.

The sum of the respective widths of these tows is somewhat in excess of 128 feet, and while a safe passage in a channel 134 feet wide was mathematically possible, as a practical matter it was a perilous thing to undertake.

The master of the Jackson expressed the situation with engaging frankness:

"Q. Is it customary to pass through that draw? A. Well, everybody that does that is a damned fool to my estimation, and I don't mean to insult anybody—not in a draw that is only one hundred and thirty-four feet wide."

The westerly draw of the bridge was closed to navigation at this time by reason of dredging operations being conducted in that channel. This fact was known to Masso, the mate who was navigating the Carmelite, but was not clearly understood by Ulrich, the captain of the Jackson until he was within less than 1,000 feet of the bridge. Since he would not in any case have tried to use the west draw, he was following customary practice in heading for the east draw.

There was a flood tide favoring the Jackson, with a force of about one-half knot.

The foregoing conditions are ·not in dispute, and therefore no findings are required.

The contested issues have only to do with:

a) The exchange of whistle signals, and

b) The precise nature of the collision, i. e., whether the 56 at her starboard bow corner struck the Hygrade at the latter's starboard bow corner, or whether the Hygrade having come in contact with the sheathing at the northeast abutment of the bridge in effect bounded off and struck the 56.

As to the signals, the testimony leaves no doubt that each vessel blew one or more signals directed to the other, but it cannot be said that there was an exchange because I am satisfied that neither captain heard the signals blown by the other until the Jackson blew a three-whistle reverse and then an alarm; at that time the striking was unavoidable.

### The Carmelite's Navigation.

This tow passed to port a wreck which has been located definitely at about 1,560 feet above the bridge, and headed generally for the easterly side of the channel in the expectation of passing safely under the draw on that side.

When this tug was about 1,000 feet above the bridge, its navigator received word from the Diamond (later to be referred to) that there was a tow approaching the draw upstream, namely from the southerly side of the bridge.

Masso admits as much, but the impression made upon his mind can best be understood by quoting his testimony:

"The Witness: Well, he told me that a tow was coming, so a tow was coming. That is all there was to it. Let him keep coming as far as I was concerned. But I couldn't see it. It was hidden behind the abutment of that bridge. So I slowed down to half speed and I kept my course over there towards the port side of the channel, which is the left side of the channel."

The indifference thus expressed by Masso can only mean that he proceeded into a situation which could be one of peril since he knew that only the east channel was available to the northbound tow.

He testified that at half speed he was proceeding at about three m. p. h. Whether he could have successfully navigated his tow so as to avoid the striking is of course beyond the province of this court to assert; but certainly he took no action in the effort to avoid trouble.

He testified at the trial that if he had tried to back up, he would have hit the center span of the bridge. Thus:

"The Court: * * * The question is, at 400 feet, if you had gone into reverse, what would have happened?

"The Witness: Well, before my barge would have got stopped, I would have turned pretty near completely around. The barge would have hit the center abutment then.

\* \* \* \* \* \*

"Q. What would have happened if you had stopped? A. Stopped?

"Q. If you had just stopped your engines? A. I wouldn't have had enough—you really haven't got good rudder power, then, if you just stop her dead.

"Q. In other words, you say that you could not stop? A. It was pretty near impossible."

The foregoing would be more convincing if Masso had not testified at the Coast Guard hearing that he first saw the green light of the upbound tow when he was about 1,100 or 1,200 feet north of the bridge.

At the trial when this was called to his attention, he said that the foregoing was right, and then the following occurs:

"Q. Then at that time, you knew that there was another vessel below

the bridge, did you not? A. Yes, sir, but I did not know whether he was waiting for the bridge to open, or what he was doing."

Since he was thus apprized at about three minutes prior to the happening of the presence of the upbound tow, it is clear to this court that he must be held at fault for not having taken some action to avoid what took place.

As to the signals, based upon the testimony of the bridge tender and his assistant, it is found that the Carmelite blew two blasts intending to indicate a starboard passing with the upbound tow; then that the Jackson blew one blast. Thereafter the Carmelite blew two, and then the Jackson blew three to indicate the reverse movement of her engines, and promptly a danger signal of four or more blasts.

Since it does not appear that either vessel heard the signals of the other prior to the three-blast signal by the Jackson, there was no exchange, and therefore there was no crossing of signals.

When the Carmelite finally decided to reduce her speed, she continued on the heading which would land her alongside the northeast abutment, and that was accomplished just about the time that the Jackson tow entered the draw.

It should be said that the Carmelite blew no danger signal.

### The navigation of the Jackson Tow.

The make-up of this tow has been explained, and as the approach was made to the bridge, Ulrich, the captain of the tug, admits that when the tug itself was about 500 feet south of the bridge, he saw the running lights and the staff lights of the Carmelite tow, and blew a one-blast signal for a port passing, which according to his version was answered with a two-blast signal, and he again blew one, and then as his tow was about to enter the draw he blew three to indicate going into reverse, and then the danger signal.

As has been said, this tow would naturally approach the east channel expecting southbound navigation to use the west, but since a neutral witness observed the Jackson at about 1,000 feet below the bridge in the middle of the channel, it would appear, and the court is convinced that this is so, that at about that distance the Jackson tow inclined to its own starboard hand. Thus it did not enter the channel under the bridge on a straight course, but somewhat inclining toward the east side of the channel.

He said at the trial that he blew the one-blast signal when he was more than 500 feet from the draw, and it could have been 1,000; therefore he was signaling to the southbound tow, which means that he knew of its presence well to the north of the bridge.

At the Coast Guard hearing he said:

"Q. How far away from the bridge were you when you gave your signal? A. I was about one hundred feet away from the bridge draw when I gave the first blast, when I sighted him."

With reference to his speed, he testified before the Coast Guard:

"A. We were going three or four knots. That is at the most.

"Q. That is when you were going at half-speed? A. That is right. I did maintain that speed in case you have to hook up."

If it is correct to say that the Jackson tow entered the draw somewhat on the diagonal, that fact would account for the apparent discrepancy between the 1,000 foot observation made by Ulrich according to his trial testimony, and that which has been quoted from his Coast Guard testimony.

If it is true, as I think it is, that this tow was approaching the draw somewhat on the diagonal, the tow being of the length heretofore stated, the teaching would be that that tow could not pass under the draw in anything like a straight line, and it is probable that the Jackson case seeks to minimize the diagonal approach which the court believes to have been the one adopted.

A reason for that view lies in the diagram drawn by the witness O'Brien who was on the bridge and observed all developments; he drew a sketch promptly after the happening, which is Libelant's Exhibit 3, and this is believed by the court to present a reasonably accurate portrayal of the shape of the Jackson tow as it entered the easterly channel under the bridge.

It is found that the starboard bow corner of the scow 56 came in contact with the starboard bow corner of the Hygrade No. 16, but it is impossible to state whether the latter was in slight motion at the time as the result of its having been somewhat in contact with the piling which guards the northeast abutment.

Mention was made above of the Diamond, which was a launch assisting the Jackson tow.

That launch was released by Ulrich of the Jackson at about 1,000 feet below the bridge, and Boroughs, who was operating the launch, proceeded under instructions to report at the place where the sand was to be delivered. While on that errand the Diamond passed within 100 feet of the Carmelite and stopped, so that Boroughs could warn Masso of the approach of the Jackson tow. He did so, and his further participation in what took place sheds no light on the happening which is the cause of this controversy.

The impression that the testimony made at the trial was that both tows were at fault, since the navigator of each approached a 134-foot opening with knowledge that there was a tow approaching from the other side. The skill of the calling required that each navigator arrest the progress of his tow until a safe passage could be had, and each failed to meet the requirement of good seamanship, as has been stated.

The judgment of the court is that this being a both-to-blame case, each is entitled to half damages, and if further or other findings are required, they may be settled on notice.